John Reginald Hoile v. Commissioner.
Hoile v. Commissioner
Docket No. 621.
United States Tax Court
1945 Tax Ct. Memo LEXIS 291; 4 T.C.M. (CCH) 247; T.C.M. (RIA) 45074; February 17, 1945
A. John Pfeiffer, C.P.A., 1316 Washington St., Columbia, S.C., for the petitioner. F. L. Van Haaften, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies of $1,576.29 and $2,704.46 in the petitioner's income tax for 1939 and 1940, respectively. The issues presented are the correctness of the respondent's action (1) in determining that the income received in 1939 and 1940 under a general insurance agency contract was taxable in its entirety to petitioner and not in part to his *292 wife and three children; (2) in disallowing $1,571.98 and $1,514.04 of the deductions taken for business expenses in 1939 and 1940, respectively; (3) in denying a loss of $14,207.17, claimed by petitioner to have resulted from the transfer of certain real estate; (4) in disallowing a deduction of $4,190.50 taken for 1940 as a bad debt; (5) in disallowing $1,750 of the deduction of $2,600 taken in 1939 for salary paid to petitioner's wife; and (6) in determining that petitioner had any income from salary or commissions in 1939 and 1940. At the hearing, the parties disposed of issue (5) by stipulating that of the deduction taken, $259.40 was not allowable. The petitioner abandoned issue (6). Issue (1). Taxability to Petitioner of the Income Received under Insurance Agency Contract Findings of Fact The petitioner resides in Columbia, South Carolina, and filed his income tax returns for 1939 and 1940 with the Collector of Internal Revenue for South Carolina. During 1939 and 1940 the petitioner was married, and living with his wife, Olivia B. Hoile. They had three children: Elise, born in September 1937, Jacquelin, born in April 1933, and Patricia, born in May 1929. The Unity *293 Life Insurance Company was organized on October 11, 1934, under the laws of South Carolina relating to fraternal benefit associations. Petitioner was instrumental in its organization, and from the time of its organization until early in 1941, was its president and general agent. He was also one of its directors and one of its trustees. Unity Life Insurance Company was a fraternal benefit society operating on a legal reserve basis, organized and operated for the benefit of its members and not for profit. Ownership was in the members. The officers, directors, and trustees were elected by the members or their delegates to the grand lodge meeting every four years. At or about the time of its organization. Unity entered into a contract with the petitioner providing for his appointment as general sales agent for all business written by or through the company, its successors and assigns. The contract provided that he would devote his full time to the business; that he would act as general manager or as any other officer that the trustees might designate; that he would pay all salesmen's commissions, keep and record their accounts, and otherwise direct the sale of all policies and certificates *294 issued by the company; and that he would pay all costs of management of the home office, salaries, supplies, etc., for the first year of the company's existence. The contract provided that the company would pay him all of the first years premiums collected and, as renewal compensation, the further amount of 25 percent of the premiums collected during the 10-year period following the date of the application for the policies. Commissions were to be paid as and when collected. That contract continued in effect until January 1939. On January 2, 1939, Unity and petitioner entered into the following contract: "GENERAL SALES CONTRACT "Between Unity Life Insurance Company, a fraternal organization, organized under the laws of the State of South Carolina and whose Home Office is located in the City of Columbia, South Carolina, its successors and assigns, forever, and John Reginald Hoile, Columbia, South Carolina, his heirs and assigns, forever. The said John Reginald Hoile, his heirs and assigns, to be appointed and to act as General Sales Agent for all the business written by and through Unity Life Insurance Company, its successors or assigns. "The Unity Life Insurance Company, its *295 successors or assigns, does hereby agree that it will pay the said John Reginald Hoile, his heirs or assigns, the sum of fifteen per centum (15%) of all premiums collected, to him as General Agent, by it as a renewal compensation. Said Commissions are to be paid as and when collected. "The aforementioned John Reginald Hoile hereby agrees to give his full time and all his knowledge and ability to the managing and building up of the United Life Insurance Company, its successors or assigns, and the same shall be done without further charge to the Company except as herein stipulated. John Reginald Hoile, his successors or assigns, will act as General Manager or any such other office that the Board of Trustees shall so designate, and shall direct the sale of all policies and certificates sold by the Company during the life of this Contract. This Contract of Agreement shall take the place of a General Sales Contract written and executed by and between the parties hereto dated at Columbia, South Carolina, on the 11th day of October, 1934, which has been signed by the Unity Life Insurance Company and John Reginald Hoile, properly witnessed and sealed. It is hereby understood and agreed that *296 as an inducement to the said John Reginald Hoile to replace and cancel, together with all liabilities thereunder, the former General Sales Contract by this Sales Contract and which is of a lower income nature than the one originally issued and mentioned herein, that the Unity Life Insurance Company, its successors or assigns, shall pay to the said John Reginald Hoile an additional salary of Twelve Thousand ($12,000.00) Dollars per year for a period from date of January 1st, 1939, for a period of seven (7) years which shall include the years from 1939 to 1945 inclusive. This Contract shall remain in force for a period of ninety-nine (99) years from January 1st, 1939, and the remuneration mentioned herein shall be effective viz., fifteen per cent (15%) of the gross premiums collected by the Unity Life Insurance Company, its successors or assigns, shall be paid to the said John Reginald Hoile, his heirs or assigns, for a period of forty (40) years. For the remaining fifty-nine (59) years, or until the end of the ninety-nine (99) year period mentioned herein, the remuneration shall be eight per cent (8%) of all premiums collected by the Unity Life Insurance Company. This Contract shall *297 cease on December 31st, in the year 2038. "This Agreement entered into and agreed to by all parties hereto, their heirs and assigns, and any change in the Board of Trustees or Directors of the Unity Life Insurance Company, its successors or assigns, shall be conditioned and agreed upon that this instrument shall be part and parcel of the said change, should and when one is made." The contract was signed on behalf of Unity by its representatives, including petitioner. The petitioner signed in his own behalf, alone and as an individual, and not as trustee for anyone. The contract was approved by Unity's board of directors on January 6, 1939. After the execution of the contract of January 2, 1939, the petitioner acted as general sales manager of Unity under the direction of its board of trustees. The petitioner's drawing account on the books of Unity was credited with his salary as well as the commissions that he was entitled to under the contract of January 2, 1939. Until December 7, 1939, Olivia B. Hoile, wife of petitioner, acted as secretary of Unity, having been re-elected to that office on October 12, 1938, for a four-year period, by the members of Unity through their delegates *298 to the quadrennial meeting. Prior to the execution of the contract of January 2, 1939, she was paid by Unity for her services. After that time, Unity continued to make payment to her for her services, but charged the amount of the payments to petitioner's drawing account on its books, and in that way the payments were borne by petitioner. During the negotiation of the contract of January 2, 1939, the petitioner told the representatives of Unity that he desired to form a corporation whose stock would be held by him and his family, and to enter into the new general sales contract in the name of the corporation. This proposal was rejected by the representatives of Unity. Thereafter, on February 1, 1939, the petitioner, as trustor, executed an instrument designated a "Trust Deed", reciting the transfer by petitioner to himself and his wife, as trustees for his wife, of an "undivided interest of one-third part in and to" the contract of January 2, 1939, between petitioner and Unity, for the following purposes: "(a) To hold the corpus of said trust estate and to administer the same, with full power and authority to said trustees, in their discretion, and upon their mutual consent and *299 agreement, to sell, barter, exchange or otherwise dispose of the original trust corpus, and to invest the proceeds of such sale, barter or exchange in other assets of equivalent value. "(b) To collect and receive the income, if any, from said trust corpus, with full power to said trustees to pay over such income monthly to said Mrs. Olivia Bourne Hoile, during her lifetime, for her use and benefit, or, upon the request of said Mrs. Olivia Bourne Hoile, to hold said income for the use of said Mrs. Olivia Bourne Hoile, and to invest and re-invest the same, in their discretion. "(c) To hold any such accumulated income, so requested to be held, and any investments or reinvestment's thereof, during the lifetime of said Mrs. Olivia Bourne Hoile, and at her death to pay over such accumulated income, if any, to the executors or administrators of the Estate of said Mrs. Olivia Bourne Hoile. "(d)-To hold the trust corpus and any changes or re-investments of same during the lifetime of said Mrs. Olivia Bourne Hoile, and at her death the surviving Trustee to offer for sale, at public or private sale, in his discretion, and to sell the trust corpus investments then held and to pay over the *300 cash proceeds to the executors or administrators of the Estate of said Mrs. Olivia Bourne Hoile. "(e) That my said Trustees, herein named, shall be relieved of the necessity of giving bond for the faithful performance and discharge of their duties." The instrument further recited that petitioner irrevocably renounced all rights, title and interest in and to the property contemplated to be transferred and assigned, or to any exchange or conversion of the same, or to any of the income, if any, accruing or arising therefrom. On the same day the petitioner also executed three separate instruments, each designed "Trust Deed", with respect to each of his three children. Each instrument recited the transfer by petitioner to himself and his wife, as trustees for a designated child, of an "undivided interest of two forty-seconds part in and to" the contract of January 2, 1939, between petitioner and Unity. The instruments, which were identical except as to the name of the child involved, contained a provision as to renunciation of all rights etc., identical with that contained in the instrument relating to petitioner's wife. Using the language of the instrument relating to petitioner's *301 daughter Patricia, as illustrative, the purposes of the transfers for the children were as follows: "(a) To hold the corpus of said trust estate and to administer the same, with full power and authority to said trustees, in their discretion and upon their mutual consent and agreement, to sell, barter, exchange or otherwise to dispose of the original trust corpus, and to invest the proceeds of such sale, barter, or exchange, in other assets of equivalent value. "(b) To collect and receive the income, if any, from said trust corpus with full power to said Trustees, in their discretion, to invest and reinvest any income received or accruing from said trust corpus. "(c) That in the event said trustees, in their discretion, should so deem necessary, then to pay over, or use, said income or any portion thereof, for, or to supplement, the cost of maintenance, support and/or education and special training of said minor daughter, Patricia Hoile. "(d) Subject to the foregoing provision in paragraph (c), and the discretionary powers therein granted, to have and to hold unto the said John Reginald Hoile and Olivia Bourne Hoile, as Trustees for Patricia Hoile, minor, the said trust corpus *302 and accumulative income, if any, in sole trust and confidence, until said Patricia Hoile shall become twenty-one years of age, and, thereafter, upon the attainment of such event to pay over to said Patricia Hoile the accumulative income, if any, of said trust estate; and, further, upon the attainment of such event, to offer for sale, at public or private sale, the trust corpus then in the hands of said trustees, and to sell the same, and to pay over the cash proceeds from such sale to said Patricia Hoile in five equal annual payments thereafter, the first of such said five annual payments to be made within 90 days after the said Patricia Hoile shall attain the age of twenty-one years. "(e) That in the event of the death of said Patricia Hoile, without surviving issue, prior to the complete fulfillment of this trust, then I do hereby direct that my said trustees shall hold the then remaining trust estate in trust and confidence for my remaining children, share and share alike, and to invest, re-invest or distribute the income, share and share alike, in the same manner as is herein provided for as to said Patricia Hoile, and that my said trustees shall hold the then remaining trust *303 corpus until the youngest of my remaining children shall attain the age of twenty-one years, at which time the corpus shall be sold and the cash proceeds distributed in five equal annual payments, in the same manner as is herein provided as to Patricia Hoile, with full power to said Trustees to change the investment in the interim, in their discretion. "(f) That in the event of the death of said Patricia Hoile, with issue, prior to the complete fulfillment of this trust, then I do hereby direct that my said Trustees shall hold the then remaining trust estate in trust and confidence for the child or children of said Patricia Hoile, share and share alike, and to invest, re-invest or distribute the income in the same manner as is herein provided for as to said Patricia Hoile, and that my said trustees shall hold the then remaining trust corpus until the youngest child of said Patricia Hoile shall attain the age of twenty-one years, thereupon distributing the cash proceeds in the same manner as is herein provided as to Patricia Hoile, with full power to said Trustees to change the investment in the interim in their discretion. "(g) That my said Trustees, herein named, shall be relieved *304 of the necessity of giving bond for the faithful performance and discharge of their duties." After the execution of the trust instruments, an account designated "J. R. Hoile Trustee Account" was carried on the books of Unity. At the end of each month, the trustee account was credited in a single entry with 20/42 (the total of the interests specified in the four trust instruments) of the commissions due for that month under the contract of January 2, 1939. The amount thus credited each month was first entered in petitioner's drawing account on the books of Unity, and then transferred to the trustee account. While the petitioner did not allow his children to use any of the income credited to the trustee account and did not maintain any special bank accounts for such income, he did maintain in his individual books of account separate pages with respect to the children. Some of the income of the trusts for the children was spent by petitioner in 1939 and 1940, $500 for each being spent for bonds which were issued in their respective names, and 110 shares of stock in Equity Underwriters, Incorporated, also issued in their respective names, were purchased. In 1940 a portion of such income *305 was also invested in a contract issued by Union Life Insurance Association, a fraternal benefit association organized under the laws of Florida. The petitioner was unable to recall whether he used any of the trust income for the maintenance of the children during 1939 and 1940. However, subsequent to 1940, some of the income was so used. Petitioner's children did not do any work for Unity during 1939 and 1940. In his income tax returns for 1939 and 1940, the petitioner reported as income 11/21 of the amounts computed by him as the commissions for the respective years under the contract of January 2, 1939, between him and Unity, and in returns filed by him as trustee for each of the children for the respective years, 1/21 of the said amounts of commissions computed by petitioner were reported as income of the children. In her returns for 1939 and 1940, petitioner's wife reported as income 7/21 of such amounts of commissions. While petitioner took credit for dependents on account of his three children, yet on the returns of the children for each of the years the personal exemption of a single person was taken, and in the returns for 1940, a deduction of $380.94 was taken for a bad *306 debt, arising from an investment in that year in the contract issued by Union Life Insurance Association, mentioned above and hereafter considered in issue (4). A deduction of $2,666.66 was taken by petitioner's wife in her 1940 return with respect to the same item. The returns of the children disclosed no tax liability. In determining the deficiencies involved here, the respondent determined that the portions of the commissions reported on the returns of petitioner's wife and children represented income taxable to petitioner and not to his wife and children. Accordingly, he increased the income reported by petitioner for 1939 by the amount $7,718.87. For 1940 respondent found that net commissions of only $12,305.34 had been withdrawn, of which petitioner had reported $10,732.04 on his return for that year, and, since petitioner reported his income on the cash basis, the respondent increased his 1940 income from this source by the difference between the two amounts, or $1,573.30. Opinion The question under this issue is whether the commissions arising under the contract of January 2, 1939, and withdrawn during 1939 and 1940, are taxable in their entirety to petitioner or are, *307 by reason of the trust instruments executed by petitioner on February 1, 1939, taxable in part to his wife and their three minor children. No question is presented as to the salary paid petitioner under the contract. An examination of the contract of January 2, 1939, discloses that it was a contract for personal services, to be rendered by petitioner to Unity in the capacity of general manager to direct the sale of policies and certificates, or in the capacity of any other like officer, as Unity's board of trustees might designate. The compensation for such services was to be the stipulated commissions, plus an annual salary of $12,000, for a period of seven years. During 1939 and 1940, petitioner acted as Unity's general sales manager, under the direction of its board of trustees. His children rendered no service to Unity. So far as disclosed, Unity's board of trustees never designated petitioner's wife to any office in which she rendered service. While it is true that during 1939 until December 7 she served as secretary of Unity, this service was rendered by reason of her election to that office, in October 1938, by the members of Unity, and not as the result of any action of Unity's *308 board of trustees or under the contract here in question. The petitioner testified that under the contract of January 2, 1939, he was required to employ and pay such help as he needed to per form the work of the office to which he was appointed by the board of trustees, that his wife helped him perform the work, and that he paid her for such services. In his 1939 return he took a deduction on account of such payments made to her, and in her return for that year she reported such payments as having been received from him. By agreement of the parties, all but approximately $259 of the amount so paid to her is being allowed as a deduction to the petitioner. From the evidence presented, it seems clear that, as between Unity and petitioner, the commissions paid by it to him in 1939 and 1940 under the above contract were for services which he rendered under the contract. Such being the case, the commissions were his income, and as such were taxable to him. Lucas v. Earl, 281 U.S. 111; Helvering v. Eubank, 311 U.S. 122; Clinton Davidson, 43 B.T.A. 576. *309 As to such income, the trust instruments were at the most anticipatory arrangements for the distribution thereof after it had been earned by petitioner, and did not relieve him of any liability for the income tax thereon. The respondent is sustained on this issue. Issue (2). Disallowance of Business Expenses Opinion In determining the deficiencies, the respondent disallowed $1,571.98 and $1,514.04 of the deductions taken for business expenses in 1939 and 1940, respectively. The petitioner has submitted no evidence with respect to these items, and he so concedes on brief. His claim of error is accordingly denied. Issue (3). Disallowance of a Deduction Taken on Account of Petitioner's Transfer of Certain Real Estate Findings of Fact Unity's charter provided that it might issue a type of insurance known as contingent endowment life insurance, and only this type of policy was issued during the first year of its existence. Thereafter it issued other types of policies, including the ordinary forms of life insurance. Under the contingent endowment life insurance policies, the policyholders of any specified age were placed in groups of 25 and numbered consecutively from one *310 to 25, the number of each policyholder corresponding to the order in which he entered the group. Upon the death of any member of a group whose number was greater than one, the beneficiary of the deceased member was paid the face value of the policy and the member whose number was one was paid the face value of his policy as an endowment and his policy was of no more effect. The member whose number was two then advanced to number one, and new members were placed in the group, at the bottom, to maintain the number at 25. In 1939 the legality of this type of insurance was generally being questioned, and, during a conference in Washington, D.C., representatives of the Post Office Department expressed an opinion to petitioner that such insurance would be outlawed. The petitioner reported this to the directors of Unity and recommended that it attempt to convert its outstanding insurance of that type to other types of insurance. In April 1939, Unity employed Cleal & Mathews, Inc., of Cleveland, Ohio, as its agent, to do the promotional and other work necessary for the conversion of its outstanding contingent endowment insurance into other forms of insurance issued by it. Although many *311 of the contingent endowment policies were converted, Unity was soon confronted with a considerable number of suits charging fraud and fraudulent breach of contract. In February 1940, Wales Fike Morris, a policyholder, instituted an action in the Court of Common Pleas, County of Richland, South Carolina, against Unity, the petitioner, his wife, and the other directors. Morris alleged that Unity had been mismanaged and that petitioner and his wife were being excessively paid. With respect to Mrs. Hoile, he alleged that over a period of years she had received about $10,000 as compensation for full-time services but had not rendered full-time services. He also asked that a receiver be appointed for Unity. There was no disposition of the suit in 1940 and no action was taken in that year on the request for the appointment of a receiver. About July 1, 1940, the Insurance Commissioner of South Carolina ordered an examination of Unity, and employed a firm of actuaries in New York to do the work. The firm sent a man named Cocheran to make the examination, who, after completing his preliminary examination, was of the opinion that due to the suits that had been filed against it, Unity would *312 be unable to continue in business in its then condition. He estimated that it had a deficit of about $19,000, as of July 1. After conferring with the insurance commissioner, and as a means of improving Unity's financial condition, the petitioner, on July 20, 1940, for a stated consideration of $5 cash, $1,500 to be paid from the first rents collected, and the assumption of the existing indebtedness thereon of $17,863.41, transferred to Unity the premises owned by him at 1316 Washington Street, Columbia, South Carolina. The premises consisted of a lot, improved by a business building thereon. The lot was purchased by petitioner on February 3, 1938, at a cost of $8,500. The building had been erected by him at a cost of $24,836.40. It was completed on July 1, 1938, and the depreciation sustained thereon to December 31, 1939, amounted to $1,265.82. After the transfer of the above property by petitioner to Unity, the insurance commissioner admitted the said property as an asset of Unity. The transfer of the property to Unity was accepted by its board of directors at their regular meeting on September 6, 1940. The action taken by the board of directors reflecting their efforts to improve *313 the financial condition of Unity is shown by the minutes of the meeting of September 6, 1940, as follows: "Mr. Hoile stated that the Cleal and Mathews matter was taken up by Cocheran who was sent here by the Insurance Department to make a survey. In his opinion, the Cleal and Mathews claim was open to discussion in that their contract called for them to defend any law suits brought as a result of their work and if there was a liability at all it was purely a contingent liability and would not be set up on the books as a liability until it was definitely decided what we owe them. * * * * *
"Report was made on the cutting of expenses. When Cocheran made his survey he estimated that we had a deficit of about $19,000.00 as of July 1st. J. M. Woolery thought that certain non-ledger assets were too low and therefore the deficit was less than Cocheran's estimate. On December, 1939, our salaries and advances totalled $6,591.37 per month. Salaries, Home Office expenses (exclusive of Georgia office rent - $50.00 per month) now total $2,486.70 a month or a saving of $4,104.67. This report has been made to the Insurance Department and Mr. King complimented the Company on it. All sales *314 advances have been cut off and everybody in the organization has been cut substantially. It is believed that this is necessary in order to show the Commissioner that we are trying to put the Company in good shape and conserve the business. "The following report was given by Mr. Holle: 'In conference with the Insurance Commissioner, I deeded this building at 1316 Washington Street, which I believe to have an equity of $22,500, to the Unity Life Insurance Company, increasing their assets conservatively, $20,000.00. I deeded this to the Company for $5.00 cash and the assumption of the mortgage which is payable $200.00 per month being the equivalent of the rent paid by the Company for the second floor, with the only reservation that I was to receive the next $1500.00 in rents, as I had some personal obligations and had pledged these rents to pay for them. I have a letter to be presented to the Directors stating my action.' Letter was read by the Secretary. It was stated that the Insurance Department had admitted the building as an asset. It will more than take care of the necessary reserves as reported by Cocheran [sic]. After some discussion, motion was made by W. E. Crowson and seconded *315 by W. E. Jennings that the building be accepted by the Company with a vote of thanks. The motion was passed with all the Directors voting 'yes' except Dr. Dove who had been called out of the meeting, and S. V. Campbell who voted 'no.' "Motion was made by W. E. Crowson, seconded by Lillian Gibson and carried that after this meeting the Directors' fees would be cut out entirely." About February 1, 1941, the application made in the above suit by Wales Fike Morris, for the appointment of a receiver for Unity, was granted. A receiver was appointed, the officers of Unity were replaced, and the petitioner no longer had any control over or management of its assets or operations. The receivership has since continued, and was still in effect at the time of the hearing in this proceeding. On July 25, 1944, however, on petition of the petitioner and his wife, Olivia B. Hoile, and pursuant to an agreement between them and Wales Fike Morris and the receiver for Unity, the petitioner and his wife, jointly and severally, were released from any and all demands or causes of action that Wales Fike Morris, as plaintiff, and the receiver for Unity, or Unity itself, might have against them. The order *316 of the court releasing the petitioner and his wife from any and all claims of liability under the suit and receivership reads as follows: "This matter comes before the Court on petition of John Reginald Hoile and Olivia B. Hoile. It appears to the Court that the Unity Life Insurance Company was chartered in October, 1934, with John Reginald Hoile as President, and, Olivia B. Hoile otherwise associated with the company. Under their administration, the annual returns filed by the company with the South Carolina State Insurance Commissioner is said to show the following condition of the company: First Year
Total Receipts
Insurance
Year
Premiums
from Members
in Force
1934
$ 7,374.59
$ 11,534.53
$ 639,000.00
1935
63,010.54
77,786.10
2,211,000.00
1936
90,724.41
160,857.26
3,664,000.00
1937
101,197.46
240,978.63
5,771,000.00
1938
122,825.98
276,780.50
6,743,700.00
1939
76,971.98
267,162.27
7,265,645.00
1940
61,197.96
152,287.48
3,475,857.00
"The decline in the company's fortune in 1940 is believed by petitioners to have resulted from the adverse effect of the suit in which this motion is In Re, and which was instituted in February, *317 1940, alleging mismanagement of the company, that petitioners were being excessively paid, and seeking the appointment of a receiver. "It further appears to the Court that John Reginald Hoile had a contract with the company whereby he sold the insurance to the public, having area managers, and soliciting agents which he supervised, and it is alleged in the petition herein that some Seventeen Million ($17,000,00.00) Dollars of insurance was written from 1934 to 1940. Of course, not that much was in force at any one time; lapses and surrenders reduced the amount in force to that shown in the above table. "John Reginald Hoile avers in said petition that the overall commissions paid by said company for the writing of said insurance was approximately Five Hundred Twenty-Nine Thousand ($529,000.00) Dollars, of which sum he received approximately One Hundred Twenty-Nine Thousand ($129,000.00) Dollars, and the area managers and soliciting agents received the balance. He denies that the cost to the company of said insurance was excessive, and while this company was new and unknown, he compares its cost of business with that of other fraternal benefit companies doing business in South Carolina, *318 although they were known and established. He says in his petition that the 1940 annual reports filed in the Office of the Insurance Commissioner of South Carolina by the following fraternal benefit companies are as tabulated below: "Company
Cost of insur-
ance as compared
with the Unity
Woodmen of the World Life Insur-
ance Society, Omaha, Neb.
75%
Preferred Life Assn. Soc., Mont-
gomery, Ala.
141%
Security Benefit Asso., Topeka,
Kansas
97%
Supreme Forest of the Wodmen
Circle, Omaha, Neb.
92%
"Other insurance companies do business in South Carolina, but since the Unity was a fraternal benefit company, only other fraternal benefit companies are used for comparison. "It also appears from the record in this case that John Reginald Hoile sold to the Unity an Eleven Thousand ($11,000.00) Dollar equity he had in a Thirty-Three Thousand ($33,000.00) Dollar building in Columbia, South Carolina, for Five ($5.00) Dollars, and that said equity was well worth the said sum of Eleven Thousand ($11,000.00) Dollars and that the Unity realized that sum on the liquidation of that asset. "The complaint made against Olivia B. Hoile was that she received a salary *319 from the Unity of Fifty ($50.00) Dollars per week, which, over the years, amounted to some Ten Thousand ($10,000.00) Dollars, which was compensation for full time work, and that she did not work full time. "Upon petition of the plaintiff in the suit herein mentioned, a receiver was appointed for the Unity Life Insurance Company, and the receivership continued to the present time. On July 28, 1941, the receiver applied to the Court for a receiver for the property of the Hoiles - the petitioners herein, secured a temporary restraining order upon filing a Two Hundred Fifty ($250.00) Dollar damage bond. That proceeding was dismissed upon hearing. On August 7, 1941, the receiver instituted another proceeding for the same purpose, securing a like restraining order and filing a like bond in the same sum. That proceeding was dismissed upon hearing. Thereafter, plaintiff instituted a similar proceeding, securing a like order and filing a like bond in the same sum, which, on motion of the Hoiles, was raised to Two Thousand ($2,000.00) Dollars. That proceeding has not been heard on its merits, and is still pending. "Petitioners believe that they have causes of action against the receiver *320 and the Supreme Court has so held (Hoile v. National Surety Corp., S.C. , S.E. ), based on the bonds in said unsuccessful proceedings, and believe they will have causes of action against the plaintiff if he fails in his said undertaking. "After the institution of the main suit herein, the institution of the proceedings therein, and suits by John Reginald Hoile on the receiver's bonds therein, it seems that these parties, as between themselves, are just about where they started. They evidently think so, because in the petition herein it is alleged that the plaintiff. Wales Fike Morris, and the receiver for the Unity Life Insurance Company, are willing to release any claim or claims they may have against the said Hoiles, and the Hoiles are willing to release said plaintiff and receiver against any liability on said bonds and so forth as shown by a copy of a release attached to and made a part of said petition. "This Court is satisfied that plaintiff and the receiver have fully investigated all angles of this matter, and, after full and complete consideration of the situation, the Court is in accord with the agreement of these parties - the continued cross-litigation will net no *321 beneficial results to any one. "Now, Therefore, upon motion of counsel for John Reginald Hoile and Olivia B. Hoile, attorneys for Plaintiff and for the Receiver of the Unity Life Insurance Company, consenting, "IT IS ORDERED: That the release of plaintiff and the receiver and of certain others, executed by the said Hoiles, a copy of which is attached to and made a part of the petition herein, be, and it is hereby accepted; and, "IT IS FURTHER ORDERED: That the said John Reginald Hoile and the said Olivia B. Hoile, jointly and severally, be, and they and each of them are hereby forever released from any and all demands, cause or causes of action whatsoever that the plaintiffs, the Receiver in his official capacity as a receiver, and (or) the Unity Life Insurance Company may have severally, and (or) jointly, between themselves or any of them, or jointly between themselves or any of them and any other (persons), (firms) or (corporations), against the said John Reginald Hoile and (or) the said Olivia B. Hoile, severally, and (or) jointly between them, or jointly between them or either of them and any other (persons), (firms) or corporations; and, "IT IS FURTHER ORDERED: That the *322 said temporary restraining order issued at the instance of the plaintiff herein - there being only one so secured by him - be, and the same is here[*] dissolved, vacated and set aside; and, "IT IS FURTHER ORDERED: That the main suit herein, in which this motion is In Re, except in so far as it affects the said John Reginald Hoile and (or) Olivia B. Hoile, shall remain unaffected by this Order. "Dated at St. Matthews, South Carolina, this 25 day of July, 1944." In reporting his income for 1940, the petitioner applied against the salary and commissions received by him from Unity, during the year, the amount of $14,207.17, being the cost of the property, less the amount of indebtedness thereon assumed by Unity and the amount of depreciation previously sustained, and carried into income only the net of commissions and salary so computed. In determining the deficiency for 1940, the respondent disallowed the deduction taken in the manner described, on the ground that the petitioner had sustained no deductible loss by reason of the transfer of the said property to Unity. Opinion With respect to this issue, the briefs of the parties leave much to be desired. The petitioner's principal *323 contention now is that he sold the property to Unity in 1940, and, by reason of the sale, sustained a deductible loss of $14,207.17. In the alternative, he contends that the transfer was a return to Unity of commissions and salary received by him in that year. The respondent, on the other hand, claims that the transfer of the property to Unity was a loan of assets, which the petitioner anticipated would be returned to him, and, being a loan, no deduction with respect thereto is allowable. The facts show that the petitioner parted with the property without any strings attached, and will not support any claim that it was transferred by petitioner to Unity as a loan. Similarly, there is no support for the claim of the petitioner that he sustained any loss from the sale of the property, since the facts show that voluntarily and without charge he intended to transfer, and did transfer to Unity all of his equity in the said property over and above the $5 received by him at the time of the transfer and the first $1,500 in rents thereafter received from the property. There is no claim or contention by *324 the petitioner that the payment or transfer of the property to Unity was an ordinary and necessary expense paid or incurred by him in carrying on a trade or business within the meaning of section 23 (a) of the Internal Revenue Code, and on the facts here, such a claim, if made, could not prevail under Welch v. Helvering, 290 U.S. 111. And since the transfer, of property created no indebtedness between Unity and the petitioner, there is no claim, or basis for claim, of deduction in respect thereto under section 23 (k), which permits the deduction of bad debts. The only other provision of the statute under which the claimed deduction might fall, and the provision on which the petitioner seems to rely, is section 23 (e), governing the deduction of losses. The losses there deductible are losses sustained during the taxable year and not compensated for by insurance or otherwise if incurred in a trade or business, or in a transaction entered into for profit, or if due to *325 destruction or loss of property through fire, storm, shipwreck or other causualty. Obviously there was no loss to petitioner of property through fire, storm, shipwreck or other causalty, and we are unable to make of the payment or transfer by petitioner of his equity in the said property to Unity a loss incurred by him in a trade or business, or in a transaction entered into for profit. The petitioner had no stock or capital interest in Unity, and the business of Unity was not his business; and by the same token, Unity's losses were not his losses. It is true that Wales Fike Morris, in his suit against Unity, had joined petitioner as a party defendant, charging liability on the part of petitioner for the mismanagement of Unity and for the collection of excessive salary, but the petitioner at all times thereafter and at the hearing in this proceeding denied that there was any merit whatever to the claim so made. In view of this denial, the dismissal of the suit as to petitioner and his wife, as evidenced by the order of July 25, 1944, and in the absence of evidence showing that he was liable, or of any claim to that effect on the part of the respondent, we cannot do otherwise than accept *326 as correct the petitioner's own claim that the transfer or payment of his equity in the property to Unity was not in satisfaction of any liability on his part, but was purely voluntary. Certainly a payment made without consideration, a gift or voluntary contribution, can in no way supply the basis for the deduction of the amount so paid or contributed as a loss incurred in a trade or business, or in a transaction entered into for profit. Sam P. Wallingford Grain Corporation v. Commissioner, 74 Fed. (2d) 453; W. F. Young, Inc. v. Commissioner, 120 Fed. (2d) 159; Reading Co. v. Commissioner, 132 Fed. (2d) 306; Balch v. Commissioner, 129 Fed. (2d) 472; Western Maryland Dairy Corporation, 32 B.T.A. 769; A. Giurlani & Bro., 41 B.T.A. 403, affd., 119 Fed. (2d) 852; White v. Commissioner, 61 Fed. (2d) 726; and Robinson v. Commissioner, 58 Fed. (2d) 810. See and compare Dresser v. United States, 55 Fed. (2d) 499; Park v. Commissioner, 58 Fed. (2d) 965; *327 and Snider B. Ward, 18 B.T.A. 326. Possibly petitioner thought that if Unity's deficit should be wiped out, its further existence would be assured and his prospects for continued employment would be enhanced. Obviously, however, the payment or transfer did not in any way affect or change his right of employment or his rate or scale of pay under his contract; he was still entitled to his salary and commissions for his services, if, as and when rendered, and the facts show that throughout the taxable year he did continue to render services and to receive compensation therefor under his contract. And there is no claim, nor is there any evidence to show, that the services required of him or the pay conditioned upon the transfer of the property to Unity. But even if we say that the property was paid to Unity to preserve his contract of employment, there is certainly no basis for saying that a loss with respect thereto occurred in 1940. See and compare A. Giurlani & Bro., supra.See also Helvering v. American Dental Co., 318 U.S. 322, wherein it was held that the forgiveness by a landlord of rents due and owing by its tenant was a gift and the fact *328 that the landlord was prompted in the act of forgiveness by business motives was said to be of no significance. The petitioner's claim to deduction in respect of the property transferred to Unity, as above described, is accordingly denied. In support of his claim for deduction, the petitioner cites and relies upon the decision of the Board of Tax Appeals in C. H. White, 15 B.T.A. 1375. There are rather definite and obvious differences in the facts of that case and the case here, and the petitioner has made no effort to show their comparability. But even if it be thought that the factual differences are not sufficient for distinguishing that case from this, our ruling there would have to give way before the authorities cited above. The The case of C. H. White is not therefore regarded as controlling. Issue (4). Disallowance of Bad Debt Deduction Findings of Fact Under date of January 1, 1940. L. J. Revel acquired a sales contract from Union Life Insurance Association, a fraternal benefit association. Union was organized under the laws of Florida, operated in that state, and had its home office in Tallahassee. James Hanratty tried to purchase the contract from *329 Revel, but his efforts were not successful. On or about January 13, 1940, petitioner acquired from Revel an option to purchase the contract for $10,000, $1,000 being paid at the time the option was granted, and $9,000 being payable on or before January 17, 1940, the expiration date of the option. The petitioner exercised the option, paid the remaining $9,000, and received an assignment of the contract. Hanratty asked the petitioner to sell the contract to him and his associates. He represented to petitioner that he had as his associates several responsible men, personally known to petitioner, that they were forming a Florida corporation to be known as First Security Corporation, of which he (Hanratty) would be president, and that the contract would be turned over to that corporation. Hanratty also gave as references some Birmingham people with whom petitioner was acquainted. In addition, the petitioner obtained a good report on Hanratty from Dun & Bradstreet. In view of the various suits that had been brought against Unity and the harassment they were causing him, the petitioner concluded that it would not be advisable for him to attempt to direct the operations of Union. Accordingly, *330 he decided that he would sell the contract at the price which he had paid for it. Under date of January 20, 1940, the petitioner executed the following instrument: "OPTION OF ASSIGNMENT OF CONTRACT "IN CONSIDERATION of the sum of One Thousand Five Tundred Dollars, ($1,500.00), receipt of which is hereby acknowledged, and the further sum of Eight Thousand Five Hundred Dollars, ($8,500.00) to be paid to me on or before midnight December 31st, 1940, I, the undersigned, do hereby give this option to sell, assign and transfer my right, title and interest now owned by me, in the contract issued to L. J. Revel by the Union Life Insurance Association, a Fraternal Benefit Association organized and existing under the Fraternal Laws of the State of Florida, and L. J. Revel, said contract being dated January 1st, 1940, and having been properly assigned to me by the said L. J. Revel, to the First Security Corporation, a corporation organized and existing under the laws of the State of Florida." Also under date of January 20, 1940, Hanratty executed and delivered to petitioner his personal note of even date for $10,000, payable on or before December 31, 1940, at the Barnett National Bank *331 of Jacksonville. The next day, January 21, 1940, Hanratty paid the $1,500 called for in the above writing and agreed orally that he would make payments on the note at the rate of $500 per month. On February 28, 1940, he made a further payment of $500, which, with the $1,500 paid on January 21, were credited by petitioner on the back of the note. Hanratty took over and operated Union Life Insurance Association, but made no further payments on the note. About the time petitioner purchased the sales contract, he conferred with the Florida Insurance Department about the financial condition of Union Life Insurance Association and was informed that it was solvent, but that its reserves needed to be increased by approximately $3,000. Since Hanratty had failed to make monthly payments on the note as he had promised, the petitioner went to Jacksonville, in July 1940, and interviewed one of the men whom Hanratty had represented as being associated with him in the enterprise. He informed petitioner that he had no connection with it. Having become suspicious, the petitioner again conferred with the Florida Insurance Department, which advised him that Union Life Insurance Association was solvent. *332 In September the department advised petitioner that, due to the amount of business that had been rewritten in Union, it would not have sufficient reserves at the end of 1940 to meet the legal requirements, unless additional money was put into it. In November 1940 the department informed petitioner that Union was insolvent to the extent of $21,000. At the end of 1940, the petitioner was not in any position financially to restore the solvency of Union and made no attempt to assert any rights which he may have had with respect to its management and operation under the Revel contract. The record is devoid of information whether Union is still being operated by Hanratty, or whether it is still in existence. From time to time during 1940, the petitioner made demands on Hanratty to carry out his agreement to make monthly payments on the note. Late in December 1940, Hanratty, brought a check for $8,000 to petitioner, in Columbia. The check was not Hanratty's individual check but that of "First Securities Corporation" of Jacksonville, of which Hanratty was president. It was drawn on the Barnett National Bank of Jacksonville, on which the checks for the January and February payments had been *333 drawn. Petitioner endorsed the check to the order of Unity, which deposited it in its account and sent it through for collection. The check was presented for payment on January 2, 1941, but payment was refused because of insufficient funds. The amount of the check has never been paid to petitioner. Upon the return of the check it was kept among the records of Unity. While petitioner does not know what efforts the receiver for Unity has made to collect the check, the petitioner has been trying to contact Hanratty since the return of the check, but has not succeeded. Dun & Bradstreet gave as good a report on Hanratty at the end of 1940 as it had at the beginning of the year. In his 1940 income tax return, the petitioner took a deduction of $4,190.50 for a bad debt on account of the option transaction, being 11/21 of $8,000, the unpaid balance on the Hanratty note. The remainder of the unpaid balance was deducted on the income tax returns of his wife and children in the proportions indicated in the facts and opinion dealing with the first issue herein. In determining the deficiency here involved for 1940, the respondent disallowed the deduction taken by petitioner. Deductions *334 of the same amounts and for the same purpose as those taken in the 1940 returns of petitioner, his wife and children, were taken in their 1941 returns, with the statement that they had been advised that the deductions taken in the 1940 returns had been disallowed. Opinion The petitioner assigned as error the respondent's failure to allow the bad debt deduction claimed, as above set forth, and further, claims that if the respondent should be sustained on issue (1) herein, he should be permitted a deduction of the entire unpaid balance of $8,000 as a bad debt. On the record before us, we are unable to say that the petitioner has shown that the debt was worthless in 1940. It is true that certain events and occurrences during the year 1940 indicate that the petitioner's prospects of collecting the balance due on the note were not as bright as they had been at the time the note was taken. For instance, at least one of the men represented by Hanratty as an associate was not a party to the venture. It is also true that Hanratty, after paying $2,000 on the note, failed to carry out his oral agreement to pay the note in advance, at the rate of $500 a month, and that the check of "First *335 Securities Corporation" for $8,000, given by Hanratty in December to cover the balance due on the note, was refused payment on January 2, 1941. On the other hand, it is to be noted that there was in fact no default on the note until December 31, 1940, when the note became due and payable, and that the check which was returned for lack of funds was not the check of Hanratty, the maker of the note, but that of his corporation. In addition, the petitioner received from Dun & Bradstreet "a very good report" as to Hanratty's financial responsibility both at the time the option was given on January 20, 1940, and at the end of the year, and without amplifying his statement, the petitioner testified at the time of the hearing that he still hoped to collect something from Hanratty on the note. Such being the state of the record, we are unable to say that the Hanratty note was worthless in 1940. There is still another reason why no deduction with respect to the Hanratty transaction is allowable in this proceeding. The instrument whereunder Hanratty took over the Revel contract from the petitioner is styled "Option of Assignment of Contract," and by its terms petitioner, in consideration of *336 $1,500, receipt of which was acknowledged therein, and the further amount of $8,500, to be paid on or before midnight of December 31, 1940, granted an option to First Security Corporation, Hanratty's nominee, to buy the Revel contract. The $1,500 called for in the said instrument was paid the following day and an additional $500 was paid on February 28. The only other payment attempted was in the form of the $8,000 check of "First Securities Corporation" delivered to petitioner by Hanratty in December, and on which payment was refused by the bank on which it was drawn because of insufficient funds. Unless we treat the delivery of the $10,000 note by Hanratty to petitioner on January 20, 1940, the date the so-called "Option of Assignment of Contract" was executed, as the exercise of the option and the completion of the sale, there would seem to be no apparent basis for the allowance of a bad debt deduction, even though it be conceded that the Hanratty note was worthless in the taxable year. Otherwise the option, not having been exercised, expired on December 31, 1940, the petitioner was still *337 the owner of the Revel contract, and since he had received $2,000 in respect of the option which had expired, it might well be argued under the rule laid down in Virginia Iron Coal & Coke Co. v. Commissioner, 99 Fed. (2d) 919, that instead of being entitled to a deduction he realized taxable gain in the amount received on the option. As to the character of the transaction, it is noted that petitioner, in his testimony, referred to it as " an option contingent upon payment for that option" and in another place, as "an option upon the payment of that note." If the condition of Union at December 31, 1940, was as petitioner testified the Florida Insurance Department represented it to be, it may be that he could have shown that he sustained a loss in 1940, due to the worthlessness of the Revel contract. In that connection, however, it is sufficient to say that the pleadings raise no such issue. In any event, the petitioner has not established his right to the deduction claimed and his claim therefor is accordingly denied. Decision will be entered under Rule 50.